DATA GENERAL CORPORATION, PLAINTIFF *v.* UNITED STATES,
DEFENDANT

Court No. 79-7-01176

Before BOE, *Judge.*

(Decided October 29, 1982)

*Baker & McKenzie (Bruce H. Jackson* at the trial and on the brief) for the plaintiff.

*J. Paul McGrath,* Assistant Attorney General; *Joseph I. Liebman,* Attorney in Charge, International Trade Field Office, Commercial Litigation Branch *(Madeline B. Kuflik* at the trial and on the brief), for the defendant.

BOE, *Judge:* In the above-entitled action the plaintiff contests the classification of the subject merchandise, printed circuit boards which are parts of office computers, under item 676.52, TSUS, "parts of office machines." Plaintiff alleges that certain components of the printed circuit boards, integrated circuits called PROMs (programmable read only memories) were fabricated components, the product of the United States, and therefore qualified for allowances under item 807.00, TSUS, which provides:

> Articles assembled abroad in whole or in part of fabricated components, the product of the United States, which (a) were exported in condition ready for assembly without further fabrication, (b) have not lost their physical identity in such articles by change in form, shape, or otherwise, and (c) have not been advanced in value or improved in condition abroad except by being assembled and except by operations incidental to the assembly process such as cleaning, lubricating, and painting
> * * *

The process of manufacturing the PROMs at issue in this case was begun in the United States by an American producer of integrated circuits. The first stage of this manufacture involved the fabrication of a silicon wafer on which microelectronic circuits consisting of interconnected transistors, resistors and diodes were designed. After wafer fabrication, the completed wafers were sent to

an offshore facility where they were sectioned into individual integrated circuit chips. Each chip was there encapsulated in order to provide a protective environment that permitted electrical signals to be more easily transmitted in and out of the individual integrated circuit. Both parties agree that in the instant action the integrated circuits were transformed into foreign products as a result of the packaging process.[1]

After packaging, the PROMs were imported into the United States and thereafter sold to plaintiff, Data General. At this stage, the capability of storing and retrieving information could not be utilized until the packaged integrated circuit had been programmed by interconnecting the discrete components in a defined logical pattern desired by the plaintiff.

In programming the imported PROMs, plaintiff's production engineers, according to a predesigned pattern, systematically caused various distinct electronic interconnections to be formed within each integrated circuit.[2] Programming bestows upon each circuit its electronic function, that is, its "memory" which can be retrieved.

The programming by plaintiff's engineers irreversibly altered the electronic pattern of each circuit.[3] For all practical intents and purposes, a PROM, once programmed, cannot be re-programmed. The PROMs, programmed for use in a computer, were then sent by plaintiff to another off-shore facility for assembly onto a finished circuit board.

Plaintiff claims that the process of programming substantially transformed the foreign PROMs into a product of the United States within the purview of item 807.00, TSUS, and 19 C.F.R. § 10.14(b).

Defendant responds that the PROMs were foreign products as a result of their "packaging" abroad, and that programming of the PROMs in the United States represented a "mere finishing or modification of a partially or nearly complete foreign product," and not a substantial transformation within the contemplation of 19 C.F.R. § 10.14(b). Defendant concludes that since fabricated components which are not the products of the United States are excluded from item 807.00, TSUS, treatment by virtue of Customs Regulation, 19 C.F.R. § 10.15, the PROMs at issue cannot be classified under item 807.00, TSUS.

Both parties agree that the PROMs are "fabricated components" of finished circuit boards assembled abroad. The sole issue before this court is whether the PROMs are "products of the United States" as defined by item 807.00, TSUS, and 19 C.F.R. §§ 10.14–

---

[1] In *Texas Instruments, Inc.* v. *United States,* 69 CCPA —, (1982), it was held that this operation, known as "packaging," substantially transforms the chips into products of the country in which the packaging took place for purposes of the Generalized System of Preferences statute (GSP), 19 U.S.C §§ 2461–2465.

[2] The interconnection can be effected by either "rupturing" existing connections or "fusing" connections together.

[3] While additional fuses could, conceivably, have been blown to create at a later date a different program, this step is very rarely taken.

10.15, thereby entitling the PROMs to an allowance under item 807.00, TSUS.

Customs Regulations define the test to be used in determining when an article has been substantially transformed into a fabricated component, the product of the United States:

> Substantial transformation occurs when, as a result of manufacturing processes, a new and different article emerges, having a distinctive name, character, or use, which is different from that originally possessed by the article or material before being subject to the manufacturing process * * * 19 C.F.R. § 10.14(b).

Defendant argues that to determine whether a foreign product has been substantially transformed in the United States, one must examine the number, duration, and cost of the various processing procedures rendered to the imported merchandise in the United States. It must then be ascertained whether these were sufficiently important, in relation to the processing which the merchandise has previously undergone. In support of this argument the defendant relies on the recent decision in *Texas Instruments* v. *United States, supra.* There the appellate court observed that the substantial transformation issue is a "mixed question of technology and customs law" and accordingly held that the numerous processing steps involved in the packaging of an integrated circuit constituted more than the mere assembly of the circuit and had been substantially transformed, while in a beneficiary developing country (Taiwan), into a "new and different article of commerce." These steps included:

> The scribing and production of chips from silicon slices; production of lead frames from metal strips; mounting and fixation of the chips onto lead frames; wiring of the chips to correct their circuitry to the lead frame contracts; encapsulation of the wired chips in the lead frame by use of a multicavity molding machine; trimmings of the lead frames to remove excess borders; and severing the strip into individual units.

In the instant action, defendant points to the numerous, complicated and time-consuming processing steps which must be undergone to manufacture a PROM, and contrasts this with the brief, one-step operation required in programming the PROM.[4] In sum, defendant concludes that at the completion of packaging, the PROM contains everything which is necessary to allow it to store and recall information and that programming of the PROM is a modification or finishing operation conducted upon a nearly complete foreign product, not a substantial transformation of that product.

---

[4] In comparing the time as well as the total cost in producing a PROM, with the process of programming it, the defendant refers to the 11 or 13 steps involved in the fabrication of the integrated circuit requiring a total of approximately 320 hours. The wafer fabrication process, however, was performed in the United States and was not a part of the packaging completed in a foreign facility.

The court is not convinced that programming a PROM is a mere modifying or finishing step. The defendant underestimates the time, expense and expertise required to program a PROM. Defendant's witness, Lindberg, acknowledges that, unlike packaging operations which can be conducted by unskilled or semi-skilled labor, programs are designed by a project engineer with many years of experience in "designing and building hardware." While replicating the program pattern from a "master" PROM may be the quick, one-step process to which the defendant refers, the development of the pattern and the production of the "master" PROM require much time and expertise.

Because of its capability to be programmed in a manner individually desired by any end user, the PROM is a recognized article of commerce in the electronic industry. Its adaptability has made obsolete the assembly of a circuit board bearing similar discrete components through manual interconnection in order to effect a desired use. To fulfill its intended character as an article of commerce capable of being programmed, the PROM requires neither finishing nor further modification.

Nor, is this court in agreement with the defendant's application of the decision of our appellate court in *Texas Instruments, supra,* to the facts in the instant action. As the Government itself argued in *Texas Instruments, supra,* at 15, "the purpose (of the GSP statute) was to promote manufacturing operations which convert *materials into articles,* as opposed to a further extension of labor intensive assembly operations which have already been promoted under the '807.00' program." The appellate court significantly pointed out that its decision was "harmonious with the legislative purpose" in the enactment of the Generalized Systems of Preferences. In so doing, the court carefully examined the "manufacturing operations" involved in the packaging of integrated circuits to ascertain whether the circuits were substantially transformed into foreign products in conformity with the statute.

On the other hand, consistent with the legislative purpose of item 807.00, TSUS, to encourage the foreign assembly of United States-made components, the Customs Regulations have specified additional criteria which determine when foreign-made articles or materials are "substantially transformed" into fabricated components, the products of the United States, which, in turn, may then be assembled abroad.[5] Under the substantial transformation test, as portrayed by the examples cited in 19 C.F.R. § 10.14(b), the court must examine not only the number, duration, cost, and complexity of the manufacturing processes involved in programming, but also whether these processes have given the article as imported a different name, character, or use. *See Hartranft* v. *Wiegmann,* 121 U.S.

---

[5] Headnote 11 of the General Headnotes and Rules of Interpretation of the Tariff Schedules of the United States authorizes the Secretary of the Treasury to issue rules and regulations governing the admission of articles under the schedules.

186

609, 615 (1887); *Anheuser-Busch Brewing Assn.* v. *United States,* 207 U.S. 556 (1908). It is sufficient that a change occur in any of the three criteria, the regulation clearly specifying the "name, character, *or* use." *United States* v. *International Paint Co.* 35 CCPA 87 (1948).

Much testimony was devoted at trial to the name given a PROM which has been programmed. In the trade, some call it a "ROM" (read only memory). Defendant's witness called it a "programmed PROM." A PROM which is "programmed" is no longer "programmable." As aforestated, a PROM can be programmed only once. In sum, a PROM when programmed, is no longer a PROM.

It is undisputed from the evidence that programming alters the character of a PROM. Programming changes the pattern of interconnections within the PROM. A distinct physical change is effected in the PROM by the opening or closing of the fuses, depending on the method of programming.[6] These physical alterations, not visible to the naked eye, may be discerned by electronic testing of the PROM. The electronic pattern introduced into the circuit by programming solely gives it the function as a read only memory. The "essence" of the article, its pattern of interconnections or stored memory, is established by programming. *Uniroyal, Inc.* v. *United States,* 3 CIT 219 (1982). The PROM has no function or use except for programming. In this sense, programming is equivalent to the assembly of a circuit board, which in 19 C.F.R. § 10.14(b) is cited as an example of substantial transformation.[7]

The sole difference between programming a PROM and assembling a circuit board lies in "the technology by which the various items are prepared and developed." As acknowledged by defendant's witness, Lindberg:

> In one case, the parts are assembled and installed in the circuit card on which the pattern of interconnects has been introduced and then solder and finished off as a separate article. In the case of a PROM, the parts are all there, built into the silicon and even the interconnect patterns are all there and the active programming blows fuses to finally introduce the information in the PROM * * * [T]he interconnection is a mechanism by which signals are carried from one to the other and it happens in both the circuit board assembly and it happens in the PROM. R. 421–22.

Thus altering the non-functioning circuitry of an integrated circuit comprising a PROM through technological expertise in order to produce a functioning read only memory device possessing a de-

---

[6] Two processes may be used in programming. The fusible link process causes a rupture of certain connections in the circuit pattern. The "Aim" process causes a short to occur within the transistor effecting a connection.

[7] Example 3. A circuit board assembly for a computer is assembled in the United States by soldering American-made and foreign-made components onto an American-made printed circuit board The finished circuit board assembly has a distinct electronic function and is ready for incorporation into the computer. The foreign-made components have undergone a substantial transformation by becoming permanent parts of the circuit board assembly. The circuit board assembly, including all of its parts is regarded as a fabricated component, the product of the United States, for purposes of item 807.00, Tariff Schedules of the United States (19 U.S.C. 1202).

sired distinctive circuit pattern, is no less a "substantial transformation" than the manual interconnection of transistors, resistors and diodes upon a circuit board creating a similar pattern. This court must not be unwilling to construe our customs laws and regulations with such elasticity as may be necessary to keep pace with the explosive advancements being made in the electronic world of today.

From the evidence adduced in the trial of the instant action, this court concludes that the plaintiff has sustained its burden in establishing that the PROMs, upon programming by the plaintiff, were substantially transformed into fabricated components, the products of the United States, and thereby entitled to an allowance provided under item 807.00, TSUS.

Let judgment be entered accordingly.